1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9          FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11  JUAN C. GONZALEZ,                    Case No.   1:21-cv-00105-KES-HBK (HC)

12              Petitioner,              FINDINGS AND RECOMMENDATIONS TO
                                         DENY PETITION FOR WRIT OF HABEAS
13      v.                               CORPUS AND DECLINE TO ISSUE
                                         CERTIFICATE OF APPEALABILITY [1]
14  RAYMOND MADDEN, Warden,
                                         FOURTEEN-DAY OBJECTION PERIOD
15              Respondent.

16
17

## I.    STATUS

Petitioner Juan C. Gonzalez ("Petitioner" or "Gonzalez"), a state prisoner, is proceeding pro se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on December 22, 2020.  (Doc. No. 1, "Petition").  Petitioner challenges convictions after a jury trial for first-degree murder in violation of Penal Code § 187(a) with a gang-murder special allegation pursuant to Penal Code § 190.2(a)(22), firearm enhancement pursuant to Penal Code § 12022.53(d), and gang enhancement pursuant to Penal Code § 186.22(b)(5); and attempted murder in violation of Penal Code §§ 664 and 187(a), with firearm and gang enhancements under Penal Code §§ 12022.53(d) and 186.22(b)(5).  (Case No. 16CR01606).  (Doc. No. 20-12 at 2-3; Doc. No. 20-1 at 192-95).[2]

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

[2] All citations to the pleadings and record are to the page number as it appears on the Case Management

1   The jury also found that Petitioner had previously been convicted of a violent felony and served a

2   prison term from which he had been free from custody for less than five years. (Doc. No. 20-1 at

3   196-99). The Merced County Superior Court sentenced Petitioner to life in prison without the

4   possibility of parole for the murder, plus 25 years to-life for the corresponding firearm

5   enhancement, and five years for the prior serious felony conviction enhancement; and a

6   consecutive term of 30 years-to life for the attempted murder, plus 25 years-to life for the

7   corresponding firearm enhancement, and five years for the prior serious felony conviction

8   enhancement. (Doc. No. 20-12 at 3; Doc. No. 20-1 at 255).

9        On appeal, the Fifth Appellate District Court reversed the prior serious felony conviction

10  enhancements and ordered the trial court to delete an erroneous reference to the 30 years to-life

11  enhancement under Penal Code §1192.7(c)(28) from the abstract of judgment, but otherwise

12  affirmed Gonzalez's conviction. (Case No. F077597). (Doc. No. 20-12 at 48-49). On January

13  13, 2021, the California Supreme Court summarily denied Gonzalez's petition for review (Case

14  No. S265371). (Doc. No. 20-14).

15       The Petition presents the following (restated) grounds for relief:

16           (1) There was insufficient evidence to support the primary actives
17           element of the gang enhancement.

18           (2) The trial court erred in admitting Petitioner's previous
             manslaughter conviction as a gang pattern prior offense.

19           (3) The trial court erred in admitting evidence relating to threats
20           made by a third-party after the offense.

21           (4) The trial court erred in allowing the prosecution to present an
             unduly specific hypothetical to the gang expert.

22           (5) The trial court erred in failing to sua sponte give a limiting
23           instruction concerning Petitioner's prior conviction.

24           (6) The cumulative effect of the errors deprived Petitioner of Due
             Process.

25  (*See generally* Doc. No. 1 at 5-6; Doc. No. 1-1 at 2-19).

26       Respondent filed an Answer (Doc. No. 19), arguing Petitioner was not entitled to relief on

27

28  and Electronic Case Filing ("CM/ECF") system.

1   any of his grounds, and lodged the state court record in support (Doc. No. 20, 20-1 through 20-

2   14).  Petitioner filed a traverse.  (Doc. No. 30).[3]  This matter is deemed submitted on the record

3   before the Court.  After careful review of the record and applicable law, the undersigned

4   recommends the district court deny Petitioner relief on his Petition and decline to issue a

5   certificate of appealability.

6   **II.    GOVERNING LEGAL PRINCIPLES**

7   **A.    Evidentiary Hearing**

8        In deciding whether to grant an evidentiary hearing, a federal court must consider whether

9   such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

10  would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474

11  (2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise

12  precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id*.  Here,

13  Petitioner did not request an evidentiary hearing; and this Court independently finds that the

14  pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary

15  hearing is required.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

16  **B.    ADEPA General Principles**

17       A federal court's statutory authority to issue habeas corpus relief for persons in state

18  custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

19  Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

20  first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

21  the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

22  of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

23  the merits, then AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*,

24  136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a

25  claim adjudicated on the merits, but only if the adjudication:

26

27

28

---

[3] The traverse contains the exact same arguments—set out in exhibits—that were submitted in support of the petition.  (*Compare* Doc. No. 30 at 7-26 *with* Doc. No. 1-1 at 2-19).

1
2

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3
4

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

5   28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

6   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

7       "Clearly established federal law" consists of the governing legal principles in the

8   decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

9   U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

10  unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

11  to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

12  governing law set forth by Supreme Court case law; or (2) reached a different result from the

13  Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

14  12, 16 (2003).

15      A state court decision involves an "unreasonable application" of the Supreme Court's

16  precedents if the state court correctly identifies the governing legal principle, but applies it to the

17  facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

18  133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

19  [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

20  extend that principle to a new context where it should apply."  *Williams v. Taylor*, 529 U.S. 362,

21  407, (2000).  "A state court's determination that a claim lacks merit precludes federal habeas

22  relief so long as fair-minded jurists could disagree on the correctness of the state court's

23  decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The petitioner must show that the

24  state court decision "was so lacking in justification that there was an error well understood and

25  comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 103.

26      When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

27  State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

28  the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Burt*

1    *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

2    merely because the federal habeas court would have reached a different conclusion in the first

3    instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

4         Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

5    constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.*

6    *Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of

7    AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-

8    prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas

9    petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable

10   precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.

11   112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails

12   to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has

13   cleared both tests." *Id.* at 134.

14        As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

15   an "adjudication on the merits" in state court. An adjudication on the merits does not require that

16   there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

17   at 98. "When a federal claim has been presented to a state court and the state court has denied

18   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

19   of any indication or state-law procedural principles to the contrary." *Id.* at 99. "The presumption

20   may be overcome when there is reason to think some other explanation for the state court's

21   decision is more likely." *Id.* at 99-100. This presumption applies whether the state court fails to

22   discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S.

23   289, 293, 298-301 (2013).

24        While such a decision is an "adjudication on the merits," the federal habeas court must

25   still determine the state court's reasons for its decision in order to apply the deferential standard.

26   When the relevant state-court decision on the merits is not accompanied by its reasons,

27              the federal court should "look through" the unexplained decision to
                the last related state-court decision that does provide a relevant
28              rationale. It should then presume that the unexplained decision

5

adopted the same reasoning.  But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do."  *Id*. at 1196.

## III.   RELEVANT FACTUAL BACKGROUND

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal.  A presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

## **FACTS**

### *Testimony of Sheila K.*

Trial commenced on March 6, 2018. Sheila K. testified for the People about the events underlying the charges.

On March 4, 2016, during the late evening, Sheila took a short walk with her boyfriend, Abram Hernandez, to a 7-Eleven near Sheila's home in Delhi. The 7-Eleven was "real close" to Sheila's house, no more than a five or six minute walk away. Sheila noted, "We were going for a pack of cigarettes and a blunt wrap."

Sheila described what happened when she and Abram got to the 7-Eleven. The prosecution also played video from surveillance cameras installed inside and outside the 7-Eleven; the video showed events that took place while Sheila and Abram were at the store. Sheila began: "Well, when we first walked into the store, it's, like – when I opened the doors, it was – everything froze, and I seen him [pointing to defendant] standing there." Sheila added, "I seen him right away. [¶] … [¶] He was staring at us." Sheila continued: "It felt – like I said, when I first walked in, I could feel – I felt tension. It just felt tense in there. It felt very dry." She testified: "[M]y boyfriend told me just – just, 'Let's go straight to the cash register and get what we're going to get and then leave. Just don't say anything,' and so that's what we did."

Gonzalez (who was wearing a blue shirt in the 7-Eleven surveillance video), was there with some other men. Sheila had not seen any of them before. She "was just very nervous because [she] wasn't quite sure what was going on." She wondered whether, unknown to her, there was some history between Gonzalez and Abram. She was scared and unsettled by the way the men "looked

at" her and Abram. She noted that one of the men "stood right behind" Sheila and Abram at the register, "and he just looked." She went on: "He just kept glaring at my boyfriend as if my boyfriend were already dead. It was a cold look." Sheila was afraid and did not want to leave the store; she told Abram they should remain in the store until Gonzalez and his friends left, to avoid any problem. However, Abram told her not to worry as the men would not do anything to them.

As Sheila and Abram left the store to walk home, Sheila felt "very nervous." Gonzalez and his friends followed them out of the store. Sheila testified: "I kept looking back to see where they were, and [Gonzalez] was watching the whole time where we were walking." At one point, Sheila saw Gonzalez and his friends outside the 7-Eleven, standing on the sidewalk, in front of a truck. Sheila said: "[Gonzalez] was on the sidewalk watching in our direction." The prosecutor played a clip from the store's surveillance cameras that showed Sheila and Abram walking away from the store and Gonzalez and his friends pacing outside.

Sheila and Abram walked down Stephens Street and eventually turned up Shell Street. Just as they were turning on to Shell Street, a truck went by, behind them, on Stephens; it was the truck that Sheila saw at the 7-Eleven (the one next to which Gonzalez and his friends were standing). The truck was white, with tinted windows and a four-door cab. Sheila said, indicating on a map: "It went past us like this real slow." After the truck passed Sheila and Abram on Stephens, it turned up Johnson Street, the next street over, after Shell.

Sheila and Abram continued walking up Shell Street towards its intersection with Hillside. There was a stop sign at the intersection of Shell with Hillside. When they were a couple of houses away from the stop sign at the intersection of Shell and Hillside, the same white truck drove by on Hillside (it had essentially driven around the block). Sheila and Abram thought the truck continued down Hillside, but they were wrong. "[W]ithin seconds," Gonzalez "came running … around the corner," on to Shell, from Hillside. Gonzalez came from the left side (the direction in which the truck had gone), rounded a fence, and got onto Shell.

Sheila instantly noted it was Gonzalez: "I noticed the same blue shirt that he had on at the store, and he ran right underneath the streetlight, so I couldn't help but see who it was." He had an "obvious" tattoo that Sheila saw as well. Gonzalez had thrown on a "gray zip-up hoodie … at this point." However, the hoodie was "unzipped," and Sheila clearly saw his shirt—which was a "bold" shade of blue—under it.

Gonzalez ran up to the first house on Shell (beyond the stop sign at the intersection of Shell and Hillside), while Sheila and Abram were two houses away from the stop sign at that point. "And [Gonzalez] said something. He pulled a gun out from his waist." Sheila noted: "It's a black gun. I don't know what kind of gun it was. All I know is he was pointing it at us." Sheila said: "It seemed,

like, really slow motion. I don't know. At first I thought he was trying to be a bully. I didn't think he was really going to pull the trigger." Abram yelled out: "'I'm not an active Northerner. I'm not an active Northerner.'" Sheila added: "I just looked at Abram, and Abram looked at me, and he pushed me and told me to run, and then that's [when] – [Gonzalez] started shooting. I heard him firing just one right after another."

Sheila testified: "[W]hen I heard the first bullet go off, I closed my eyes, and I just kept running. I don't even know where I was running to." Sheila added: "I just could hear the gun shooting … nonstop. It was just repetitive until I got hit." Sheila was shot in the right leg and collapsed on the ground. She testified: "I know when I hit the ground, I opened my eyes, and I looked, and I seen [Gonzalez] running back around the corner." Sheila went to look for Abram. She said: "I seen him laying in the road in the same exact spot he was at when I ran."

The street was deserted that night. Sheila said: "It was like nobody was around that neighborhood at that time." She testified: "I was screaming. I was screaming for anybody to come outside. I wanted somebody to come help us." Nobody came. Sheila tried calling 911, twice – but "they did not answer." Sheila "just kept screaming" and "ran towards the stop sign." She said: "I seen the white truck come back in front of me again." The truck "just went by really slow." The prosecutor asked, "And this would have been when you're standing at the end of Shell Street?" Sheila answered: "At the stop sign, yes. It's the stop sign at Hillside." Sheila did not see anyone in the truck.

Sheila testified: "I ran back towards where Abram was because I didn't want him – I didn't want him to die on that blacktop." She continued to scream. Eventually "one of the neighbors opened the door and yelled that he had called the cops." A man who was working on a car somewhere on Hillside and was passing through Delhi, "came from around the corner" to help, because he heard Sheila screaming. Sheila testified: "[At that point], I was standing by Abram listening to the blood gurgle in his chest and his mouth. That's all I could hear waiting for somebody to come help." Sheila added: "I can't even describe how I was feeling at that time. I was just – I was so scared." Finally, a police officer arrived. Thereafter, it "seemed like everybody showed up."

The prosecutor asked Sheila: "And how much time passed, by your estimate, from when you left 7-Eleven – from when you left the store and started walking down the street and when you and Abram were shot?" Sheila answered: "It was just about – it was just minutes. My house is only, like, five minutes from [the 7-Eleven]." Once she and Abram left the store, the shooting would have been a matter of "two or three minutes." She added, "I live right around the corner from where [the shooting] happened." Sheila also clarified that during the walk back from the 7-Eleven, down Stephens to Shell, and up Shell towards where Hillside crossed Shell, no other vehicle went by except the white truck.

Abram was "medi-flighted" for medical treatment but "died early that morning." Sheila was taken by ambulance to the hospital; the prosecutor admitted into evidence, medical records establishing that Sheila had suffered a gunshot wound to her leg.

Sheila had dated Abram for five or six months but had known him for longer. She said: "He used to be a Northerner, but then he dropped out, and he moved to Delhi." Abram was not an active Northern gang member at the time of the shooting.

The prosecutor asked Sheila whether Sheila was "sure" that Gonzalez was the man who ran up and shot Abram and Sheila. Sheila responded: "I'm absolutely positive."

The prosecutor then addressed the events of August 2016, that is, a period five months after the shooting (which had occurred on March 4, 2016). Sheila identified a picture of a man who came to her door in August 2016. The man had overlapping "tattoo letters on his face." The man was later identified as Luis Prado (Sheila identified him in a photograph). Sheila explained: "He said that he knew where my whole family lived, and that if I was to testify – come here to testify, that he was going to kill somebody in my family. He said he knew where my daughter lived in Stockton, my granddaughter went to preschool. He said he knew everything about my family." She added: "He said it would be in my best interest not to testify on this case." The man's words scared Sheila.

Sheila also reported other incidents: "Small things that had happened since I had been shot, and I just thought I was maybe reading too much into it. Like, somebody came in the middle of the night and was spinning the tires out in front of my house yelling things and pointing their headlights at my house[,] flashing it. I mean, things being thrown at my house." Sheila had cooperated with the police with regard to the shooting and had also testified at a pre-trial hearing in the matter.

On cross-examination, Sheila acknowledged she had also reported an auto theft involving her daughter; the theft had occurred before the instant shooting. The auto theft incident was charged as a carjacking and Sheila had testified in that matter as well. Sheila also acknowledged she had two felony convictions for receiving stolen property.

### Police Investigation

Merced County Sheriff's Sergeant Raymond Framstad was dispatched to the scene of the shooting at 10:56 p.m. on March 4, 2016. He saw Sheila and others standing in the roadway and Abram lying on his back in the middle of the street. Abram appeared to have a wound on his forehead and blood was pooling under his head, he "also had blood coming from [the] side area of his sweatshirt." Sheila had been shot in the back of her right calf. She was "very distraught." Seven "9[-]mm gold Winchester cartridge casings" were found at the scene that night; three more were recovered a few days later, when improved weather allowed for a

more thorough search.

Dr. Mark Super, a forensic pathologist, performed Abram's autopsy. He located two gunshot wounds. One was on "the inside surface of the left upper arm," or armpit area, exiting out of the "right front of the neck." The bullet that caused this wound went through the armpit and hit a major blood vessel and then the larynx or voice box, possibly impairing Abram's his [sic] ability to breathe. The other bullet wound was to Abram's forehead; the bullet in this case "went into the head and resulted in brain injury." Each bullet wound was potentially fatal, independently. Both the bullets that entered the body were atypical and deformed, indicating they hit the ground or ricocheted off the ground prior to entering body. Dr. Super also noted that Abram had various tattoos on his body, including "Merced," "Forever Forward, and "W."

Sometime after 11:00 p.m. on the night of the shooting, Merced County Sheriff's detectives reviewed surveillance footage at the 7-Eleven and took "still frames" of the footage that were shared with other detectives. Fairly quickly, a detective in the department, Detective Samuel Becerra, identified, based on the still frames, Gonzalez and the two friends with him, on account of previous contacts with all of them. The two friends with Gonzalez were identified as Adrian Garcia and Jesus Ivan Mendoza. Becerra also examined the Facebook accounts of Gonzalez and Adrian Garcia (the latter two were Facebook "friends"). Becerra testified: "[B]oth Facebook accounts were open to the public, so I went ahead and went through the pictures and seen that there were multiple pictures that were gang related and had Mr. Gonzalez in them." The pictures of Gonzalez revealed a "Delhi" tattoo on his neck (Becerra noted that "Gonzalez is from Delhi, went to Delhi High School"). Becerra described one of the photographs: "On the very top you have the skulls, and it says 'Delhi' here on the very top left corner, you can say. Then it says 'Ghost Town' here (indicating)." Ghost Town Sureños (GTS) was a local criminal street gang in Merced County and surrounding areas.

Another photograph that Detective Becerra described—various versions of this photograph were admitted into evidence—depicted Gonzalez and Adrian Garcia, along with three other men (two of whom were identified as Aldo Lepez and Daniel Lizarraga), at the gravesite of Marcos Naranjo-Servin, a known GTS member.

Detective Becerra further determined, from the Facebook photographs, as well as post-arrest photographs of Gonzalez, that Gonzalez had a "tattoo of 'Delhi'" on his neck, a "2-0-9" tattoo on his chest (with a skull in the "0"), and three dots tattooed on the left side of his wrist, along with tattoos of "Ghost Town" on his back and "Ghost Town Sureños" on his right forearm. As for Mendoza, based on photographs shown to Becerra by the prosecutor, Becerra confirmed that Mendoza had a "D" tattooed on the back of his head and "GTS" tattooed on his right forearm.

Sergeant Clint Landrum drove out to Gonzalez's residence around 2:00 a.m., on the night of the shooting, in an unmarked car. As

Landrum was approaching a nearby intersection, Gonzalez drove by him in a white Nissan Frontier and pulled into the driveway of his house. Landrum had viewed the surveillance footage from the 7-Eleven as well as a prior booking photograph of Gonzalez. Landrum recognized Gonzalez "from the huge Delhi tattoo on his neck," which was clearly depicted in the booking photograph of Gonzalez that Landrum had consulted earlier. After Gonzalez pulled up to his house, Landrum "established a fixed point of surveillance on the residence" and remained there until other officers arrived to execute a search warrant at approximately 5:30 a.m. Landrum assisted the officers in executing the search warrant.

During the search, the key to the Nissan Frontier was found on a dresser in Gonzalez's bedroom. A pay stub from Gonzalez's place of employment was found in his room as well. In addition, two blue bandanas were discovered in a box on his nightstand. Landrum testified that the surveillance footage from the 7-Eleven showed Gonzalez in a white "long-sleeved thermal type of shirt" with a "blue Polo-style shirt" on top. The white thermal and blue polo shirt were found together, inside out, and were collected from Gonzalez's room. A hat Gonzalez was seen wearing on the surveillance footage was also collected.

The vehicles on the property were searched. Gonzalez's driver's license was found on the floorboard of the Nissan Frontier truck he was driving earlier that night. Another truck parked on the property contained a box of nine-millimeter ammunition. Yet another vehicle contained a backpack holding numerous rounds of ammunition for various types of rifles and other firearms, metal knuckles, tactical vest attachments, a drop-leg-style pistol holster, magazine carriers, a multi-tool with screwdrivers and blades, pistol grips, ammunition holders, a rifle scope, and a laser attachment for a gun.

California Department of Justice Criminalist Kaitlin Bauer tested the blue polo shirt obtained from Gonzalez's bedroom and found one gunshot residue particle on, respectively, the right sleeve, left sleeve, and shirt front. This was a "low-level positive" for gunshot residue, but gunshot residue particles are easily displaced or removed, and samples tested in the lab generally yield low-level positive or negative results. Bauer explained that an important factor in this context was "the amount of time that has elapsed between when the incident happened and when [the relevant items] were sampled," among other factors.

### Testimony of the People's Gang Expert

Merced County Sheriff's Deputy Tim Goncalves testified as a gang expert for the People. He served on the Department of Justice's "Merced Area Gang and Narcotic Enforcement Team" for "[a]lmost four years[,] from February 2014 to January of 2018."

Deputy Goncalves testified: "Primarily in Merced County Hispanic criminal street gangs are the most prevalent[,] which would consist of Norteño criminal street gangs and Sureño criminal street gangs." He added: "[B]eing in Northern California, specific to Hispanic

11

gangs, Norteños are predominantly what take up territory in Northern California."

Deputy Goncalves explained: "So street gangs are a derivative from prison gangs, California prison gangs, specifically dating back into history in the '50s and '60s. You have two of the more predominant Hispanic prison gangs that evolved, one being the Mexican Mafia[,] [regarding] which the letter 'M' in the alphabet is used by Sureño criminal street gangs to directly pay homage or respect to the Mexican Mafia." He continued: "Similar[ly][,] [the] Nuestra Familia being the Norteño prison gang, the letter 'N' is synonymous with paying respect to and homage for Nuestra Familia prison gangs." He went on: "So that being said, these Sureño and Norteño criminal street gangs are essentially subsets that are functioning underneath the umbrella of these prison gangs."

The Sureño and Norteño subsets are rivals with each other and have separate, identifying colors, numbers, and symbols. "Blue has been a color that's been adopted primarily by the Sureño criminal street gangs," and "red [is] the predominant color identified and associated with Norteños or the Nuestra Familia." Sureños identify with the number 13 as "M" is the 13th letter in the alphabet; Norteños identify with the number 14 as "N" is the 14 letter of the alphabet. These numbers are sometimes represented, respectively, as one dot and three dots (for 13) or one dot and four dots (for 14). The numbers 13 and 14 may also be represented simply by, respectively, three dots and four dots.

Merced County has numerous Norteño subsets, including West Side Merced or WSM; Merced Ghetto Boys or MGB; Dead End Locs or DEL; Loughborough Locs or LBL; Rebels Before Locs or RBL; and Norteños for Life or NFL. There is a subset known as Livas in the Livingston area. In the Atwater area, there is a subset called North Side Atwater. In Delhi, there are the Delhi Locs and the Varrio Delhi Locs Norteños. Deputy Goncalves named additional Norteño subsets in Le Grand, Planada, Dos Palos, and Los Banos; he noted there were additional subsets in the adjoining areas of Salinas, Watsonville, and Gilroy.

As for the Sureño subsets in Merced County, Deputy Goncalves noted: "Merced has never really been known as a stronghold for Sureños. There's a lot of transient activity. There's been members who have a part of or who had influence with some of the subsets in and around the Merced city area which would include SSL, South Side Locs. We have Los Primos, are two of the subsets that some of their members frequent the Merced area more; however, are more transient." Goncalves went on to name Sureño subsets in "Santa Nella/Gustine," Atwater, Winton, and the "west side" of Merced County. He also testified: "And then moving north in and around the Livingston, Delhi, Ballico, Cressey areas we have GTS, which is [an] abbreviation for Ghost Town Sureños. They have been identified to have transient activity not only in our county but in Stanislaus [county], to include townships or cities Hughson [and] Waterford."

12

Regarding the signs and symbols associated with the GTS gang, Deputy Goncalves testified: "So as I previously stated, Ghost Town Sureños, short abbreviated form of that would be the letters GTS, alongside with the common Sureño symbols 13, one dot, three dots in a triangle." Other symbols used by GTS included "a skeletonized Grim Reaper or skulls." GTS also identified with the color, blue. Goncalves estimated there were "around 12-15" active GTS members in Merced County, whereas Sureños in Merced County, collectively, numbered "in the 75 range." One source that Goncalves spoke to in his "patrol career," self-identified as "one of the founding members" of GTS; this person told Goncalves that the GTS was formed "around late '80s, early '90s." However, Goncalves himself became aware of GTS in 2008, when he joined the sheriff's department, as a court security deputy.

Goncalves testified about predicate offenses, as defined in section 186.22, subdivision (e), committed by the GTS gang. He noted, with reference to a certified abstract of judgment dated February 27, 2014, that Jesus Ivan Mendoza (one of the men who was with Gonzales at the 7-Eleven), was convicted of possession of methamphetamine for sale, pursuant to Health & Safety Code section 11378. With reference to photographs of Jesus Mendoza, Goncalves further testified that Mendoza had a tattoo of the letter "D" that represented the "township of Delhi," as well as two tattoos of the letters "GTS" that represented Ghost Town Sureños. Finally, Goncalves testified, based on Mendoza's tattoos, his presence in the 7-Eleven with Gonzalez, and his conviction for drug sales, that he was a member of the Ghost Town Sureños gang.

Deputy Goncalves next testified, with reference to a certified abstract of judgment dated February 26, 2010, that Aldo Lepez was convicted of assault with force likely to cause great bodily injury (former section 245, subd. (a)(1)), with a gang enhancement (section 186.22, subd. (b)(1)(A)). The prosecutor admitted into evidence photographs of Lepez wearing blue clothing. The photographs also showed Lepez had multiple tattoos of "Ghost Town Sureños" and the number "13" in numerals and dots, on his body. In addition, Goncalves identified Lepez in a photograph in which Lepez was with four other men, including Gonzalez, Adrian Garcia (who was with Gonzalez and Mendoza at the 7-Eleven), and Daniel Lizarraga. Goncalves indicated he knew, from personal experience, four of the five men in the photograph to be members or associates of the GTS (Goncalves was referring to Lepez, Gonzalez, Adrian Garcia, and Daniel Lizarraga). The photograph showed the men at the gravesite of another GTS member, Marcos Naranjo-Servin, who was "killed in a gang murder"; the gravesite was adorned with blue decorations and Sureño memorabilia. Goncalves opined, based on Lepez's tattoos, blue clothing, and presence at the gravesite in a group of known GTS members, that Lepez was an active GTS member.

Deputy Goncalves further testified, with reference to a certified abstract of judgment dated January 31, 2011, that Daniel Lizarraga was convicted of carrying a loaded firearm on one's person, in violation of section 12031, subdivision (a)(1). With reference to a

photograph of Lizarraga, Goncalves testified that Lizarraga had a black dot on his right hand and three black dots in a triangle formation on his left hand, signifying, collectively, the number 13, that in turn represents the letter M, and is a sign of "respect and homage to the Mexican Mafia." Another photograph depicted Lizarraga "using his fingers to make the number 3, which is just a short version of the number 13." Lizarraga was also featured in the photograph of the group of GTS members, including Gonzalez, Adrian Garcia, and Aldo Lepez, at the gravesite, decorated in blue, of the murdered GTS member, Marcos Naranjo-Servin. Based on these photographs and the crime committed by Lizarraga, Goncalves opined that Lizarraga was an active member of the Ghost Town Sureños.

Finally, Deputy Goncalves testified, with reference to a certified abstract of judgment dated January 29, 2013, that Gonzalez, the defendant, was convicted of voluntary manslaughter pursuant to section 192, subdivision (a) with a firearm enhancement under section 12022.5, subdivision (a). When Gonzalez went to prison in 2013 for this offense, he was "identified as a Mexican Mafia associate and a Sureño criminal street gang member specifically with Ghost Town Sureños." Although Gonzalez was not required to register as a gang member in connection with the crime, when he was paroled, he was subject to "gang conditions." After his release from prison, Gonzalez appeared in the photograph with fellow GTS members Adrian Garcia, Aldo Lepez, and Daniel Lizarraga, at the gravesite, bedecked in blue, of the murdered GTS member, Marcos Naranjo-Servin. Goncalves pointed out that Naranjo-Servin was murdered in Delhi in June 2015; indeed, the photograph showing Gonzalez, Adrian Garcia, Aldo Lepez, and Daniel Lizarraga at his gravesite showed his headstone with the date June 2015 on it. Goncalves clarified that the fact that Naranjo-Servin died in June 2015 meant that Gonzalez and the other men were gathered at the gravesite *after* Gonzalez had served his prison term for his manslaughter conviction.

The prosecutor then asked Deputy Goncalves: "So we've gone over assaults, possession of firearm, voluntary manslaughter, use of firearm, drug sales. Are these the primary activities of the Ghost Town Sureños and [the] larger Sureño criminal street gang?" Goncalves responded: "Yes." Without specifically referencing the GTS, Goncalves added that other gang primary activities would include: "mayhem, various series of assaults which are being committed with or without weapons, but also to include firearms, and then also to include the most grave of them being murder." The prosecutor asked: "And how does drug sales play into Ghost Town Sureños and the Sureño criminal street gang?" Goncalves responded: "[A]ffording [to them] the ability to traffic and distribute narcotics allows for unaccounted income which can be redistributed to purchase more narcotics and drugs and is also used to purchase firearms. Firearms being a primary weapon for not only offensive activity by individuals but also defensive against – I think it's important to [note], not only rival gang members, but *former* members of not only rival gangs but also their own gang." (Italics added.) Goncalves added: "The phrase blood in/blood out is not

14

uncommon or is not an exaggeration." Goncalves observed that the Ghost Town Sureños subset and the larger Sureño criminal street gang were both "still ongoing in their pattern of criminal activity."

The prosecutor then commented, "I want to talk to you now a little bit about the defendant, Juan Gonzalez." The prosecutor played the surveillance video from 7-Eleven. Goncalves noted that, as shown in the video, Gonzalez was wearing a "bright vibrant blue Polo," and "that color blue is definitely an identifier" of his gang affiliation. He was also wearing a hat with a "black D," which "symbolizes the township of Delhi."

Deputy Goncalves added: "The fact that [Gonzalez is] with Mr. Mendoza and Mr. Garcia also plays a part in identifying who it is that he associates with and does so in a public place and is not only associating with them, but is doing so with what you would consider as being flamed out, wearing your colors in the gang culture." Goncalves observed, with reference to the surveillance video played by the prosecutor, that the behavior of Gonzalez, Mendoza, and Garcia in the 7-Eleven—after Abram, a Norteño dropout entered the store—was indicative of gang tactics. He explained: "So the fact that the three of them triangulate and kind of separate, yeah, it could substantiate that they were all three looking for … various items in the store; however, if you go to … when the victim walks in and see how from their three positions when the victim walks in, how the center of attention transfers from what they're now doing to now the victim and their triangular positions on the victim, that is not a mistake. That is very calculated, and that was done with specific intent to focus on [Abram]."

Deputy Goncalves continued, with reference to the surveillance video: "Now, yes, to the common eye it appears as if Mr. Mendoza has something in his hands and is going to pay for something, but based on my training and experience and my knowledge specific to when criminal street gang members are encountered with somebody who is potentially a threat, i.e., a rival gang member or a rival dropout, it is imperative to try to position yourself to be in an offensive position or defensive position, and that is what I believe happened when the victim walked up to the cash register, and then immediately after doing so walks directly to the exit in which he entered the store." Goncalves went on: "[Thereafter,] Mr. Gonzalez walked out of that same south entrance of the store where he walked in, came around the southwest corner of the 7-Eleven, and put himself in a vantage point to where he could see [Abram] [¶] … [¶] Mr. Gonzalez and Mr. Garcia put themselves in a vantage point to where they can watch [Abram] and [Sheila] walking in a northern direction on Stephens away from the store. That is not done by accident. That is done tactically and with [an] intent to keep his eye on [Abram]." Goncalves further explained: "And if you notice … [Abram] … looked back. That was, I think one of several times where, as he was exiting the store … he kept looking over his shoulder back in the direction of Mr. Gonzalez, Mr. Garcia and Mr. Mendoza."

The prosecutor asked Deputy Goncalves: "And so from that, the

defendant following the victim, [Abram], out of the store and watching where he was, in addition to what he's wearing in that video, and the fact that he's with other gang members, does that continue to contribute to whether or not you have an opinion as to whether Mr. Gonzalez is a criminal street gang member?" Goncalves answered in the affirmative. Goncalves added that Gonzalez had multiple tattoos, such as "Delhi," "209" [the local area code], and a skull. Goncalves said the skull symbol was an identifier for the GTS gang and the skull tattoo was a gang tattoo. Gonzalez had other gang tattoos, including a "Ghost Town Sureños" tattoo and a tattoo of three black dots (a reference to the number 13 and the letter M).

Deputy Goncalves also discussed a number of photographs of, and Facebook posts by, Gonzalez, which depicted GTS symbols, including "a skull-type figure." In one photograph Gonzalez was wearing blue clothing and a tattoo was clearly visible on his neck. The prosecutor asked whether the photograph revealed GTS identifiers. Goncalves responded in the affirmative. The prosecutor showed Goncalves other photographs of Gonzalez in blue clothing; she also showed him the blue bandanas found in Gonzalez's room when the search warrant was executed, as well as a photograph of Gonzalez throwing gang signs. Goncalves said the clothing, bandanas, and gang signs were relevant to his determination as to whether Gonzalez was a member of a criminal street gang.

Finally, the prosecutor showed Goncalves the afore-mentioned photograph of GTS members at the blue-adorned gravesite (Gonzalez appeared in that photograph). The prosecutor asked whether the photograph reflected any gang-related identifiers. Goncalves answered, "Yeah, there's several." He explained that the photograph showed Gonzalez with Aldo Lepez, Daniel Lizarraga, and Adrian Garcia, all of whom were members or associates of the Ghost Town Sureños. Goncalves continued: "The color blue here. Obviously, Mr. Lepez is wearing this hat which I previously talked about, the color blue portrayed and displayed over Mr. Naranjo-Servin's headstone, and the fact that I know that Mr. Naranjo-Servin was murdered in a gang-motivated homicide in the Delhi area; furthermore, was done at the hand of two Delhi Loc Norteño rival gang members, which [case] I was the expert on as well; and then the fact that they're collectively together visiting their friend, their fallen friend, and drinking beer." Ultimately, Goncalves opined: "I believe based on my training and experience and the indicators shown to the jury today that Mr. Gonzalez is an active member of the Ghost Town Sureño criminal street gang.

Deputy Goncalves addressed the status of the victim, Abram Hernandez, as well. He said that Abram was a Norteño dropout. He said Abram had tattoos to the effect of "Forever Forward," "Merced," and "W." Goncalves testified: "Based on my training and experience, 'Forever Forward' is common in the Norteño criminal street gang world and along with the Nuestra Familia. It's like a salutation when one individual is ending a conversation to the other. It's a gesture that is done as a form of reminder of the cause in terms of what they choose to be a part of." He added: "The 'W'

16

and 'Merced' are synonymous, from my training and experience, to be identifiers with the [Norteño] subset West Side Merced." Goncalves further explained: "By the nature of things because he is a dropout Norteño criminal street gang member there would be several people that if [they] came into contact with [Abram] … whether it was a Norteño or a rival Sureño gang member – would put [Abram] into a jeopardizing situation."

Deputy Goncalves also testified about Luis Prado, who Sheila identified, by means of a photograph, as the man who came to her door several months after Abram was killed and attempted to dissuade her from testifying. Based on prior contacts with Prado, Goncalves testified he had an "LTS" tattoo and was a member of Little Town Sureños, a Sureño subset "derived out of Stanislaus County, specifically the rural areas, to include, Hughson and Waterford." Little Town Sureños had around nine members. Prado also had a tattoo reflecting the number 13 in the form of X's and dots, as well as another tattoo reflecting the number 13 in the form of dots. Goncalves further explained: "Mr. Prado moved into the township of Delhi back in, like, 2009-2010 and has remained living in Delhi, and in that time I know from previous contacts he – because of his Sureño ties – started to associate with Ghost Town Sureño members in the Delhi area, not to limit his association with just GTS, but that's how I came to learn about Little Town Sureños."

The prosecutor presented a hypothetical to Deputy Goncalves—the facts of which mirrored the facts of the instant case—and asked him to assume the hypothetical facts were true. At the end of the hypothetical she added: "Several months after this, a Sureño criminal street gang member comes to the home of the girlfriend who survived and says something to her to make her scared to come and testify in the incident that happened in which the Sureño street gang member killed her boyfriend." The prosecutor then asked: "Would you have an opinion as to whether or not those crimes, both the murder of the man who was associated with the Norteño criminal street gang and the attempted murder of his girlfriend who was with him, was done for the benefit of, at the direction of or in association with the Ghost Town Sureños and the larger Sureño criminal street gang with a specific intent to promote street gang activity?" Goncalves answered, "Yes."

Goncalves explained his answer to the hypothetical posed by the prosecutor. He said: "So the means to get to a point after identifying the victims and then subsequently doing so dressed in the way that you are and in such a tight-knit community is a means, based on my training and experience, to be offensive and to prove a point. That is a show of dominance. That is that that act of shooting and killing [a] perceived rival – or a perceived dropout from a rival gang is done so to maintain and/or reestablish dominance within that community specific to gang culture." Goncalves continued: "Furthermore, the efforts to shoot and kill the female, based on my training and experience, would be done so in an effort to get rid of any witness, material witness. [¶] A lot of times in gang crimes citizens of the community are apprehensive to come forward with

1

2

3

4

5

6

7

8

9

10

11

information in fear of retaliation by gang members, and history has shown, my personal experience has shown in this job that it happens quite often. [¶] That being said, having a Sureño member go to the surviving victim's house is a prime example of how those efforts are done in terms of trying to impose fear in a community in an effort to maintain dominance, and that they continue to do these criminal acts and are done in a manner that minimize[s] the amount of them who may be detected by law enforcement."

On a different note, Deputy Goncalves clarified that the process of firing a nine-millimeter semi-automatic firearm results in the barrel of the gun moving around, a phenomenon known as "muzzle flip." He testified: "[T]he concept that I'm trying to get across is that when it's fired, the gun under recoil rises, dips back down, settles, and then can be re-engaged however many times there is a bullet or however many bullets are loaded into a magazine." The prosecutor asked Goncalves: "So essentially the process can cause the gun to move around as people are firing it, if they're firing up to seven to [ten] shots; is that correct?" Goncalves answered: "Correct." The prosecutor followed up: "So that would account for different trajectories that may end up." Goncalves replied: "Correct."

12    (Doc. No. 20-12 at 3-21 (footnotes omitted)).

13    **IV.    ANALYSIS**

14    Respondent acknowledges that each of Petitioner's grounds were raised on direct appeal

15    to the Fifth Appellate District Court and denied on the merits, then subsequently raised and

16    summarily denied by the California Supreme Court.  Thus, each ground is exhausted, and the

17    Court looks through to the Fifth Appellate District's reasoned decision in evaluating each of

18    Petitioner's claims under the deferential standard of review.  *Wilson*, 138 S. Ct. at 1192.

19    **A.    Ground One-Sufficiency of the Evidence**

20    In his first ground, Petitioner argues there was insufficient evidence to support the

21    "primary activities" element of the gang enhancement.  (Doc. No. 1 at 5).  Petitioner asserts that

22    "something more than *bare expert conclusory assertions* of primary activities was needed to

23    distinguish occasional pattern crimes by individual members from primary or chief GTS

24    activities."  (Doc. No. 1-1 at 2).

25    **1.  State Court Decision**

26    In denying Petitioner's sufficiency claims, the Fifth Appellate District court found as

27    follows:

28

The active gang participation special circumstance allegation (§ 190.2, subd. (a)(22)) attached to count 1 and the gang enhancement allegations (§ 186.22, subd. (b)) attached to counts 1 and 2, required proof of the existence of a criminal street gang as defined in section 186.22, subdivision (f).

Section 186.22, subdivision (f) defines "'criminal street gang'" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in [subdivision (e)], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) The acts set forth in subdivision (e), include possession of drugs for sale, assaults with a deadly weapon or with force likely to cause great bodily injury, carrying a loaded firearm, and unlawful homicides and manslaughter. (§ 186.22, subd. (e).)

"Therefore, the 'criminal street gang' component of a [gang special circumstance or] gang enhancement requires proof of three essential elements: (1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a pattern of criminal gang activity.'" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222 (*Vy*); see *In re Alexander L.* (2007)149 Cal.App.4th 605, 610-611.)

Gonzalez argues the evidence presented at trial was legally insufficient as to the "primary activities" element encompassed in the definition of a criminal street gang. We reject this contention.

Pursuant to section 186.22, subdivision (f), a criminal street gang must have, "as one of its primary activities[,] *the commission of one or more of the criminal acts enumerated in* [section 186.22,] subdivision (e)." In assessing the nature of the gang's primary activities, the trier of fact may look to both the past and present criminal activities of the gang. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) Isolated criminal conduct, however, is not enough. "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) "Also sufficient might be expert testimony" based on an adequate factual foundation. (*Ibid.*)

Here, Deputy Goncalves was deeply familiar with gangs operating in Merced County. He served for almost four years with the Department of Justice's Merced Area Gang and Narcotic Enforcement Team, specifically from February 2014 to January 2018. Goncalves testified: "I have taken no less than a 100 hours of formal training specific to criminal street gangs ranging from gang-member identification, criminal street gang identification, prison gangs, gang prosecution, case law … cultural aspects of criminal

street gangs. I have probably over a thousand hours of informal training specific to gangs for the last four years. Assigned to the DOJ Task Force, every day was spent investigating gangs or gang members of some sort." Goncalves added: "I've been a part of no less than seven investigations which are identified as T3 or wiretap investigations all specific to criminal street gangs ranging from San Joaquin County to Monterey County, Stanislaus County, Merced County, Madera County, Fresno County, Tulare County and Kern County." In 2016, Goncalves was "co-case agent" in "Operation Scrapbook," which targeted "Sureño criminal street gangs in and around the Merced County area which culminated into [law enforcement] identifying and infiltrating members within the Mexican Mafia."

Deputy Goncalves estimated he had contacted "hundreds" of gang members in his career and was very familiar with gangs and gang members in Merced County. He described his interactions with gang members in the county: "To be specific, all of the interviews weren't necessarily just conducted as investigatory. I mean, I wasn't necessarily investigating a crime that had occurred in order to facilitate those conversations. Part of my auxiliary duties as well with the sheriff's office is for the last four years I've done every gang registration pursuant to Penal Code 186.30, which is basically that a court has deemed an individual to be a gang member … and that is a noncriminal interview or conversation. [¶] I have contacted former and current members in noncriminal situations where talks of culture, their gang activity come up." Goncalves named the Sureño subsets in Merced County and said he had "contacted individuals from all of the Sureño subsets that [he had] previously mentioned." The prosecutor summed up Goncalves's experience: "So you've been involved in investigations with gang members and formally investigated them. It sounds like you've registered them, and then you've also had numerous informal conversations with them as well; is that right?" Goncalves responded: "That's correct." Goncalves had also testified as a gang expert in court "no less than 20 times," as a "conservative" estimate.

Regarding the number of members of the Ghost Town Sureños, Goncalves testified: "Still active now I would estimate 12 to 15; however, that doesn't necessarily identify individuals who are no longer in Merced County that still may be active, however, are for whatever reason, not in Merced County." Goncalves testified that the primary purpose of street gangs was to engage in criminal activity, including committing crimes such as "mayhem, various series of assaults … with or without weapons, but also to include firearms, and then also to include the most grave of them being murder." In addition to the evidence of the instant crimes (which included murder, a crime that is enumerated in section 186.22, subdivision (e)(3)), the prosecution introduced evidence of four specific prior crimes also committed by members of the Ghost Town Sureños, all of which are similarly enumerated in section 186.22, subdivision (e). These crimes were possession of methamphetamine for sale committed by Jesus Mendoza on December 12, 2013 (§ 186.22, subd. (e)(4)); assault with force likely to cause great bodily injury (with a gang enhancement)

committed by Aldo Lepez on April 11, 2008 (§ 186.22, subd. (e)(1)); carrying a loaded firearm on one's person committed by Daniel Lizarraga on May 13, 2010 (§ 186.22, subd. (e)(33)); and voluntary manslaughter committed by Gonzalez on August 15, 2009 (§ 186.22, subd. (e)(3)).

Goncalves testified—based on his training and experience, the evidence of the specific, predicate crimes described above, and the charges in the instant case—that commission of assaults, firearms offenses, drug sales, and manslaughter constituted the primary activities of the Ghost Town Sureños. With respect to drug sales and firearms offenses, moreover, he explained the reason why GTS members committed these crimes. Goncalves said: "[T]he ability to traffic and distribute narcotics allows for unaccounted income which can then be redistributed to purchase more narcotics and drugs and is also used to purchase firearms. Firearms being a primary weapon for not only offensive activity by individuals but also defensive [activity] – I think [firearm use is] important [not only with respect to] rival gang members, but *former* members of not only rival gangs but also their own gang." (Italics added.)

Given Goncalves' extensive experience with Merced County criminal street gangs, including the Ghost Town Sureños, the evidence regarding the predicate offenses committed by GTS members, and the evidence in the present case, we have no difficulty concluding the evidence supporting the "primary activities" element of the definition of a criminal street gang, as relevant to the gang special circumstance and gang enhancements charged in the instant case, was readily sufficient. In other words, there was substantial evidence for the jury to find that GTS members "*consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324.)

(Doc. No. 20-12 at 21-25 (footnotes omitted)).

### 2. Analysis

At the outset, Petitioner does not explain how the state court's rejection of this claim was unreasonable or based on an unreasonable determination of the facts. In evaluating this claim, the undersigned reviews the state court's reasoned decision under the deferential standard of review applying clearly established federal law.

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The federal standard for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). Under *Jackson*, "the relevant question is whether, after viewing

1   the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

2   found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in

3   original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under

4   *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare

5   rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the jury's

6   verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed

7   with the jury").

8       The *Jackson* standard "must be applied with explicit reference to the substantive elements

9   of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*,

10  408 F.3d 1262, 1275-76 (9th Cir. 2005).  The reviewing court should look to state law for the

11  elements of the offense and then turn to the federal question of whether any rational trier of fact

12  could have found the essential elements of the crime supported by sufficient evidence beyond a

13  reasonable doubt.  *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

14      Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed

15  under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012).  As noted by

16  the Supreme Court:

17

18          First, on direct appeal, "it is the responsibility of the jury−not the
            court−to decide what conclusions should be drawn from evidence
            admitted at trial. A reviewing court may set aside the jury's verdict

19          on the ground of insufficient evidence only if no rational trier of
            fact could have agreed with the jury." And second, on habeas

20          review, "a federal court may not overturn a state court decision
            rejecting a sufficiency of the evidence challenge simply because the

21          federal court disagrees with the state court. The federal court
            instead may do so only if the state court decision was 'objectively

22          unreasonable.' "

23  *Coleman*, 566 U.S. at 651.

24      California Penal Code § 186.22(b) provides for a sentencing enhancement when an

25  individual is convicted of a felony committed for the benefit of, at the direction of, or in

26  association with a criminal street gang, with the specific intent to promote, further, or assist in

27  criminal conduct by gang members.  "Criminal street gang" is statutorily defined as an "ongoing,

28  organized association or group of three or more persons, whether formal or informal" who have at

1    least one of its "primary activities" the commission of one or more crimes specified elsewhere in

2    the statute, who share a common name or common identifying sign or symbol, and whose

3    members collectively engage in, or have engaged in, a pattern of criminal gang activity. Cal.

4    Penal Code § 186.22(f).

5         Here, the state court reasonably determined there was sufficient evidence to support the

6    primary activities element of the statutory definition of a criminal street gang.  Goncalves testified

7    regarding his background with the gang task force, his training, and his experience with criminal

8    street gangs, including specifically with the Norteño and Sureño gangs.  (Doc. No. 20-7 at 36-53).

9    Goncalves also testified regarding predicate offenses including possession of drugs for sale,

10   assault with great bodily injury, carrying a loaded firearm, and manslaughter, all of which he

11   identified as being listed in § 186.22(e).  (*Id.* at 55-66).  Goncalves identified specific features

12   linking the offenders of the predicate offenses to the Sureños, including tattoos, clothing, and

13   presence at the grave site covered in blue of a known Sureño member.  (*Id.* at 56, 60-64).

14        Viewing this evidence in the light most favorable to the prosecution, it was objectively

15   reasonable for the state appellate court to determine that there was substantial evidence to support

16   the primary activities element.  As such, the state appellate court's rejection of Petitioner's

17   sufficiency of the evidence claim was not contrary to, or an unreasonable application of, clearly

18   established Supreme Court precedent, nor an unreasonable determination of the facts.  The

19   undersigned recommends that ground one be denied.

20        **B.    Grounds Two, Three, and Four-Evidentiary Issues**

21        Petitioner challenges the admission of various evidence at trial.[4]  In ground two, Petitioner

22   challenges the admission of his previous manslaughter conviction as one of the predicate offenses

---

23   [4] In connection to these evidentiary challenges and the following instructional challenge,
     Petitioner argues that any failure by his trial counsel to "do more to preserve state or federal
24   claims" amounts to ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S.
     668, 689 (1984).  (Doc. No. 1-1 at 6, 9, 12-13, 16-17).  Based on the phrasing—specifically,
25   reference to "preserving claims" and claims being cognizable—and Petitioner's indication that
     the Petition contained six grounds for relief, the Petition does not appear to assert separate
26   ineffective assistance of counsel claims.  Rather, such arguments are raised as grounds to
     overcome any procedural bar.  Because the Court does not rely on a procedural bar as the basis to
27   deny relief on any of Petitioner's grounds, it need not further address the ineffective assistance of
     counsel claims.  Alternatively, in light of this Court's findings and recommendations contained
28   within that each of Petitioner's grounds be denied, Petitioner cannot show that he was prejudiced

1    to support the gang enhancement.  (Doc. No. 1-1 at 5-6).  In ground three, Petitioner argues the

2    trial court erred in allowing the evidence of threats made to a Shelia after the crime occurred.  (*Id.*

3    at 8).  In ground four, Petitioner challenges the "highly case-specific gang expert 'hypothetical'"

4    presented to Goncalves.  (*Id.* at 11).

5              **1.  State Court Decision**

6         In denying Petitioner's evidentiary challenges, the Fifth Appellate District court found as

7    follows:

8              **II.  The Court's Admission of Gonzalez's Voluntary
          Manslaughter Conviction as a Gang Pattern Prior**

9

10        Gonzalez argues the trial court prejudicially erred in admitting his
          prior manslaughter conviction as a predicate offense for purposes of
11        proving the existence of a criminal street gang, which is a required
          element of the gang special circumstance attached to count 1 and
12        the gang enhancements attached to counts 1 and 2. Gonzalez's prior
          manslaughter conviction was a qualifying predicate offense under
13        section 186.22, subdivision (e)(3). Predicate offenses need not be
          gang-related in the sense that there is no requirement that the
14        offense be shown to qualify for a gang enhancement (*People v.
          Gardeley* (1996) 14 Cal.4th 605, 625, overruled on other grounds
15        by *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13), and proof
          of a conviction is unnecessary (*People v. Garcia* (2014) 224
16        Cal.App.4th 519, 524).

17        In addition, evidence of predicate offenses committed by members
          of a gang is relevant to proving the gang's primary activities. (*Vy,
18        supra,* 122 Cal.App.4th at pp. 1227-1228 [evidence of commission
          of crimes enumerated in § 186.22, subd. (e) may "satisfy both the
19        'primary activities' requirement under subdivision (f) and the
          'pattern' requirement under subdivision (e)"]; *Sengpadychith,
20        supra,* 26 Cal.4th at p. 324 [evidence that gang members committed
          predicate offenses by itself may be sufficient proof of gang's
21        primary activities]; § 186.22, subd. (f) [evidence of "the
          commission of" qualifying predicate offenses establishes proof of
22        the gang's primary activities].) And, in a case involving a
          substantive gang offense under section 186.22, subdivision (a), or a
23        gang special circumstance under section 190.2, subdivision (a)(22),
          evidence of the defendant's own prior offense provides proof not
24        just of a predicate offense, but also of the elements that the
          defendant actively participated in a gang and that the defendant
25        knew the gang engaged in a pattern of criminal gang activity. (See
          *People v. Tran* (2011) 51 Cal.4th 1040, 1050 (*Tran*).)

26        We review a trial court's evidentiary ruling for abuse of discretion

27    _____

28    by any alleged deficient performance by counsel.  As such, he is not entitled to relief.

                                        24

and will not overturn the ruling unless it falls "'outside the bounds of reason.'" (*People v. Waidla* (2000) 22 Cal.4th 690, 714; *People v. Williams* (2009) 170 Cal.App.4th 587, 606 ["The trial court has great discretion in determining the admissibility of evidence, and on appeal, we find reversible error if the trial court's exercise of its discretion was arbitrary, capricious, or patently absurd resulting in a manifest miscarriage of justice."].) We cannot say the trial court abused its discretion in admitting proof of Gonzalez's prior manslaughter conviction.

In *Tran*, the California Supreme Court held as follows: "[A] predicate offense may be established by evidence of an offense the defendant committed on a separate occasion. Further, that the prosecution may have the ability to develop evidence of predicate offenses committed by other gang members does not require exclusion of evidence of a defendant's own separate offense to show a pattern of criminal gang activity." (*Tran*, *supra*, 51 Cal.4th at p. 1044.)

However, such admission is still subject to analysis under Evidence Code section 352. "That evidence of a defendant's separate offense may be admissible to prove a predicate offense does not mean trial courts must in all cases admit such evidence when offered by the prosecution. Considerations such as those described in *People v. Ewoldt* [1994] 7 Cal.4th [380] at pages 404-405, … will still inform the trial court's discretion and in an individual case may require exclusion of the evidence." (*Tran*, *supra*, 51 Cal.4th at p. 1049.) "But Evidence Code section 352 requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative … [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome."'" (*Tran*, *supra*, at p. 1047.)

The *Tran* court reviewed the *Ewoldt* factors that are relevant to the admission of a defendant's prior offense in a gang case, for various purposes. *Tran* instructs: "The probative value of the evidence is enhanced if it emanates from a source independent of evidence of the charged offense because the risk that the witness's account was influenced by knowledge of the charged offense is thereby eliminated. [Citation.] On the other hand, the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction. This is because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense and because the absence of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred. [Citation.] The potential for prejudice is decreased, however, when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense." (*Tran*, *supra*, 51 Cal.4th at p. 1047.)

Here, the court carefully examined the prior manslaughter conviction through the lens of Evidence Code section 352. The

court stated: "Well, under Evidence Code [section] 352, obviously [the prior manslaughter conviction] does have some prejudice, but I do think the [prejudice] is outweighed. I mean, in this whole case before the Court they're going to bring in evidence of gang activity. There's a special circumstance that this was a gang killing in this case, so I think the fact that he has a prior crime which qualifies under [section] 186.22 is certainly very relevant and would be admissible to show a pattern of gang activity even if it doesn't have an allegation."

The evidence established that Gonzalez had committed a prior manslaughter, a qualifying predicate offense, and Deputy Goncalves testified that manslaughter, as a form of unlawful homicide, was a primary activity of the Ghost Town Sureños. Thus, the court correctly understood the prior conviction had clear probative value to the prosecution's case. The fact that Gonzalez was *convicted* of the prior manslaughter limited the potential for confusion of the issues. Moreover, the evidence related to the prior manslaughter was *independent* of the instant charges, enhancing its reliability. In addition, evidence related to the manslaughter conviction consisted of the operative charging document (as amended in accordance with plea negotiations), a minute order reflecting that Gonzalez pleaded no contest to a charge of voluntary manslaughter with a firearm enhancement, and the abstract of judgment issued in the case. The prosecutor asked Goncalves precisely five questions with reference to the abstract of judgment, without any digression into the underlying facts. In addition, it was revealed that when Gonzalez went into prison for the offense, he was identified as a GTS member, and when he was eventually paroled, he was subject to gang conditions. The relatively quick and sanitized presentation of evidence related to the prior manslaughter limited the prejudice arising from it. Finally, although the manslaughter conviction was accompanied by a firearm enhancement, it was still considerably less inflammatory than the current charges, a murder and attempted murder under truly chilling circumstances

We recognize the prior manslaughter was admitted as a predicate offense, and, therefore, was ultimately probative as to multiple elements of the People's case. However, *Tran* explains that the fact that a predicate offense may provide direct evidence of "[multiple] elements of the prosecution's case … does not weigh against its admission." (*Tran*, *supra*, 51 Cal.4th at p. 1048.) *Tran* also explained that where—as here—"the prosecution is required to establish the defendant was an active participant in a criminal street gang and had knowledge of the gang's criminal activities, the jury inevitably and necessarily will in any event receive evidence tending to show the defendant actively supported the street gang's criminal activities. That the defendant was personally involved in some of those activities typically will not so increase the prejudicial nature of the evidence as to unfairly bias the jury against the defendant." (*Ibid.*) Indeed, *Tran* noted that "the use of evidence of a defendant's separate offense to prove a predicate offense should not generally create an 'an intolerable "risk to the fairness of the proceedings or the reliability of the outcome."'" (*Ibid.*)

26

1

2    Here, Deputy Goncalves explained that several local criminal street gangs were engaged in criminal activities; more specifically, he testified the primary purpose of criminal street gangs was to

3    commit the types of crimes enumerated in section 186.22, subdivision (e). Further, the prosecution introduced evidence of

4    multiple predicate offenses committed by members of the Ghost Town Sureños (of which Gonzalez was a member). Indeed, Jesus

5    Mendoza, who committed one of the predicate offenses, was with Gonzalez on the night of the instant shooting. Gonzalez also

6    associated, for gang purposes, with Aldo Lepez and Daniel Lizarraga, each of whom committed a predicate offense. And

7    Adrian Garcia, the other GTS associate who was with Gonzalez on the night of the instant shooting, was also seen hanging out, with

8    Gonzalez, Lepez, and Lizarraga, at the gravesite, adorned with gang memorabilia, of a slain GTS member. In addition, there was ample

9    evidence of Gonzalez's longstanding participation in the Ghost Town Sureños. Gonzalez's voluntary manslaughter conviction was

10   admitted against this backdrop. Under *Tran*, we cannot say the trial court abused its discretion in admitting Gonzalez's prior

11   manslaughter as a predicate offense.

12   Gonzalez argues admission of his prior manslaughter was unnecessary because the prosecution had other options for proving

13   the requisite predicate offenses. This argument is foreclosed by *Tran*, which clarified that the fact that "the prosecution might be

14   able to develop evidence of predicate offenses committed by other gang members … does not require exclusion of evidence of a

15   defendant's own separate offense to show a pattern of criminal gang activity." (*Tran, supra,* 51 Cal.4th at p. 1049 ["the prosecution

16   cannot be compelled to '"present its case in [a] sanitized fashion"'"].) However, *Tran* also noted: "[A]lthough the court need

17   not limit the prosecution's evidence to one or two separate offenses lest the jury find a failure of proof as to at least one of them, the

18   probative value of the evidence inevitably decreases with each additional offense, while its prejudicial effect increases, tilting the

19   balance towards exclusion." (*Id.* at p. 1049.) Numerous cases, though, have upheld the admission of more than two predicate

20   offenses. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436 [upholding six predicate offenses]; *People v. Hill* (2011) 191

21   Cal.App.4th 1104, 1137-1139 [upholding eight predicate offenses].) In short, here, the People had the discretion to admit the predicate

22   crimes committed by Aldo Lepez, Daniel Lizarraga, and Jesus Mendoza, as well as by Gonzalez himself.

23

24   To the extent Gonzalez attempts to argue that the *facts* underlying his prior manslaughter conviction somehow negate its probative

25   value and require exclusion of the conviction as a predicate offense, we cannot evaluate that claim at this juncture, in a vacuum. Defense

26   counsel did not adduce, in the trial court, the plea colloquy or other evidence establishing the factual basis of Gonzalez's no-contest

27   plea in that case. Nor can we resolve any claim of ineffective assistance of counsel based on counsel's failure to do so, as counsel

28   may well have had good reason to *not* disclose the factual basis of the plea. Indeed, when the trial court was considering the

27

1
2
3
4
5

admissibility of Gonzalez's prior manslaughter conviction, the prosecutor indicated the offense had occurred at "a gang party," and "gang overtones [were] involved." Defense counsel responded: "Well – but that's not going to be part of the record. That's not what it's being introduced for, and I just think it's confusing – it's potentially confusing to the jury to have a case that does not involve gang allegations used against my client in this proceeding to say that this is proof of gang activity because it's the charge that is admissible, not the circumstances."

6
7
8
9
10
11

Even if we were to assume the trial court erred by admitting Gonzalez's prior manslaughter conviction, the error would be harmless. Erroneously admitted evidence of prior crimes is not prejudicial where "it is not reasonably probable that a result more favorable to defendant would have resulted absent admission of this evidence." (*People v. Welch* (1999) 20 Cal.4th 701, 749-750; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Gonzales suggests admission of evidence of his prior manslaughter conviction was highly prejudicial because it falsely painted him as a person who commits crimes for gang purposes and invited the jury to convict him for the instant charges on propensity grounds.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

However, the instant crimes were classic gang-related crimes. Surveillance footage from the 7-Eleven showed Gonzalez was dressed in gang clothing; he wore a "bright vibrant blue Polo" and a hat with "black D." He had conspicuous gang tattoos, particularly, a "huge Delhi tattoo on his neck." He was with Jesus Mendoza, a GTS member, and Adrian Garcia, a GTS member or associate. When Abram entered the 7- Eleven with Sheila, as a Norteño dropout with Norteño tattoos, he immediately attracted Gonzalez's attention. Gonzalez and his two associates then took up "calculated," tactical, "triangular positions" within the 7-Eleven on account of gang-related imperatives. After Abram and Sheila left the store, Gonzalez followed them outside and took note of the direction in which they were walking. Ultimately, he and his two associates came after Abram and Sheila, in Gonzalez's white truck. The prosecutor described what happened next in her closing argument: "And once [Gonzalez] spots his prey walking up Shell Street, he decides it's got going to be enough to stop there and shoot and kill them, no. He needs the element of surprise and ambush. So what does he do? He drives around the block, passes the street, and then gets out and runs up to them." Sheila testified she was "absolutely positive" it was Gonzalez who ran up and shot multiple times at Abram and her. Gonzalez's clothes were recovered later that night, and gunshot residue was detected on the front of his shirt as well as both sleeves. A subsequent search led to the recovery of nine-millimeter ammunition in two vehicles outside Gonzalez's residence. The prosecution also introduced evidence, with respect to the GTS gang, of multiple predicate offenses and primary activities, even without Gonzalez's manslaughter conviction, along with evidence of interconnections between GTS members. Given this record, it is not reasonably probable that Gonzalez would have obtained a different result absent the admission of evidence of his prior manslaughter conviction.

In light of our conclusion that the trial court did not abuse its discretion in admitting evidence of Gonzalez's prior manslaughter conviction, we also reject Gonzalez's contentions to the effect that admission of this evidence by the trial court violated due process. Nor was this a situation where, irrespective of the propriety of the trial court's ruling, admission of the prior manslaughter violated due process because it rendered the trial fundamentally unfair. (Cf. *People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230.)

## III.  Admission of Threats Delivered by Luis Prado to Sheila

Gonzalez argues the trial court erred in admitting evidence of the threats made by Luis Prado to Sheila, when he came to her house in August 2016, approximately five months after the March 5, 2016 shooting underlying the instant charges. Gonzalez further argues the evidence of the threats made by Prado was so inflammatory that its erroneous admission amounted to a due process violation. We reject both these contentions. The evidence was properly admitted, and in any event, any error was harmless.

The prosecutor moved in limine to admit evidence showing that Luis Prado went to Sheila's house on August 15, 2016, and threatened her and her family in attempting to dissuade her from testifying in court in the instant matter. Defense counsel, for his part, moved in limine to "exclude any so-called 'gang' evidence which occurred after March 5, 2016." The trial court concluded the evidence proffered by the People was relevant, "especially given the charges in this case," and admitted it.

Sheila subsequently testified that Prado, whom she identified from a photograph, came to her home several months after the shooting and threatened to kill her family members, were she to testify in court. He knew where Sheila's family members lived and told Sheila it was in her best interest to not testify. Prado also told Sheila that she would not make it to the courtroom or make it back home from the courtroom. Prado had overlapping letters tattooed on his face. Prado's threats to her safety, and his threats to kill her family members, scared Sheila.

Except as otherwise provided by statute, "all relevant evidence is admissible." (Evid. Code, § 351.) "'[R]elevant evidence' is all evidence 'including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action' ([Evid. Code,] § 210)." (*People v. Green* (1980) 27 Cal.3d 1, 19 (*Green*), overruled on other grounds by *People v. Martinez* (1999) 20 Cal.4th 225) "[T]he trial court is vested with wide discretion in determining relevance under this standard." (*Green*, *supra*, at p. 19.) We review the trial court's evidentiary rulings for abuse of discretion. (*People v. Sanders* (1995) 11 Cal.4th 475, 512.) Here, we detect no such abuse.

A witness's testimony at trial that the witness was threatened by a third party is admissible not for the purpose of proving the truth of the matter stated, but because it is relevant to the credibility of the

witness. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084 ["[E]vidence of a 'third party' threat may bear on the credibility of the witness, *whether or not the threat is directly linked to the defendant*." (Italics added.)].) It is circumstantial evidence that the witness was fearful on account of the threat, in coming forward to testify, and the witness's fearfulness, in turn, is relevant to show "the existence … of bias, interest or other motive" harbored by the witness, or the witness's "attitude toward the action in which he testifies or toward the giving of testimony." (Evid. Code, § 780, subds. (f) and (j); *Green*, *supra*, 27 Cal.3d at pp. 19-20; accord *People v. Burgener* (2003) 29 Cal.4th 833, 869 [evidence that a witness is afraid to testify, *and an explanation for the basis of that fear*, is relevant to assess the witness's credibility]; *People v. Malone* (1988) 47 Cal.3d 1, 30 [testimony that a witness is fearful of retaliation is relevant to the witness's credibility]; *People v. Warren* (1988) 45 Cal.3d 471, 481 [evidence a witness is afraid to testify is relevant to credibility]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1367-1369 [that the witness is testifying despite fear of recrimination, and the facts necessary for the jury to evaluate the fear, is relevant to credibility].)

In *Green*, various prosecution witnesses testified about threats they had received with regard to testifying, their concerns for their personal safety, and ensuing protective measures taken by the authorities to ensure their safety. (*Green*, *supra*, 27 Cal.3d at pp. 19-20.) *Green* held that, notwithstanding that the threats were not linked to the defendant, testimony about the threats to the witnesses was admissible in evidence to enable the jury to fully evaluate witness credibility. (*Ibid.*)

*People v. Olguin*, *supra*, 31 Cal.App.4th at pages 1368-1369, explains the rule as follows: "A witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake in the testimony. Just as the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility [citation], the fact a witness is testifying despite fear of recrimination is important to fully evaluating his or her credibility. For this purpose, it matters not the source of the threat…. [¶] Regardless of its source, the jury would be entitled to evaluate the witness's testimony *knowing* it was given under such circumstances. And they would be entitled to know not just that the witness was afraid, but also, within the limits of Evidence Code section 352, those facts which would enable them to evaluate the witness's fear. A witness who expresses fear of testifying because he [or she] is afraid of being shunned by a rich uncle who disapproves of lawyers would have to be evaluated quite differently than one whose fear of testifying is based upon bullets having been fired into her house the night before the trial."

Here, Sheila testified that Prado's threatening visit made her fearful to come to court to testify. Indeed, Prado had threatened she would not make it to the courtroom or back home if she testified in this case. The jury was entitled to know that Sheila was threatened and was afraid, along with sufficient facts to be able to evaluate that fear. Because Sheila was the sole witness who identified Gonzalez

as the shooter, and because the defense elicited testimony that she had previously been convicted of two felonies for receiving stolen property, her credibility was at issue. In this context, evidence tending to show that Sheila came to testify despite her fear was highly relevant to the issue of her credibility.

Evidence of Prado's visit to Sheila's house to scare her into not testifying was also relevant to the gang-murder special circumstance and gang enhancements charged in this case. Deputy Goncalves testified that although Prado was previously associated with the Little Town Sureños subset in Stanislaus County, he had relocated to Delhi, where he associated with GTS members. Goncalves further testified: "A lot of times in gang crimes citizens of the community are apprehensive to come forward with information in fear of retaliation by gang members, and history has shown--my personal experience has shown in this job that it happens quite often. [¶] That being said, having a Sureño member go to the surviving victim's house is a prime example of how those efforts are done in terms of trying to impose fear in a community in an effort to maintain dominance, and that they continue to do these criminal acts and are done in a manner that minimize[s] the amount of them who may be detected by law enforcement." The evidence of Prado's attempt to dissuade Sheila from testifying was therefore relevant to showing the Gonzalez's crimes were for the benefit of his gang. We do not find, moreover, that admission of evidence of Prado's conduct was an abuse of discretion under Evidence Code section 352, given the copious amount of evidence of gang activity already in the record.

It is true that evidence of a third party's attempt to suppress testimony is inadmissible against a defendant to show his consciousness of guilt unless there is evidence the defendant authorized the action. (*People v. Hannon* (1977) 19 Cal.3d 588, 599, overruled on other grounds by *People v. Martinez* (2000) 22 Cal.4th 750.) Here, however, the evidence was not ultimately used to suggest Gonzalez was personally behind Prado's threats. Rather, the prosecution relied on this evidence to explain that Sheila was afraid to testify but nonetheless overcame her fears in light of the importance she placed on testifying, and to show that Gonzalez's crimes were for the benefit of the gang.

Gonzalez nonetheless argues that the court should have given a "limiting instruction requiring evidence of authorization by the defendant," and the lack of such an instruction was prejudicial. More specifically, he contends the jury should have been instructed it "may only consider third party attempts to suppress testimony if defendant was present or authorized the conduct," pursuant to CALCRIM No. 371. However, Gonzalez did not request any such instruction and has therefore forfeited this contention. (*See People v. Carpenter* (1999) 21 Cal.4th 1016, 1050, fn. 6.) In any event, here the threats were relevant to witness credibility and the gang-related nature of the crimes; there was no suggestion or argument made to the jury that the threats at issue reflected a consciousness of guilt on the part of Gonzalez. Thus, a limiting instruction of the kind described by Gonzalez was not warranted. To the extent

Gonzalez argues counsel was ineffective for not requesting a limiting instruction to this effect, we reject the claim. A limiting instruction along the lines of CALCRIM No. 371 was not warranted and counsel was not ineffective in failing to request one. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1038 [failure to make a meritless objection does not constitute ineffective assistance of counsel].)

**IV.  Gang Hypothetical**

Gonzalez next challenges the validity of the prosecutor's use of a "highly detailed hypothetical mirroring the prosecution case," arguing it "effectively directed a verdict, denying [him] his state and federal rights to a fair trial and a jury determination on all issues beyond a reasonable doubt." We reject the contention that the hypothetical was improper.

During the trial, the prosecutor asked Deputy Goncalves, the People's gang expert for his interpretation of a hypothetical set of facts:

"Deputy Goncalves, I'm going to give you a set of hypothetical facts and ask you to assume that they are true and ask you to render an opinion on them. I'd like you to assume that an individual who at one time may have been associated with the Norteño criminal street gang and his girlfriend enter a store. Inside the store are at least two active Sureños, specifically, Ghost Town Sureño criminal street gang members, in there along with one other individual. One in particular is wearing a blue Polo shirt, wearing a hat with a D on it, and that person makes eye contact with the individual that was at one time associated with the Norteño criminal street gang.

"After the man and his girlfriend leave the store, the Sureño street gang member who is wearing the blue shirt and hat with a D on it walk out of the store and watch them walking down the street. A few minutes later, the individual who was at one time associated with the Norteño criminal street gang and his girlfriend are walking down the street, they see a vehicle pass them that has been associated with the Sureño criminal street gang member who was wearing the blue shirt, and then a few minutes later drive right in front of them as they continued to walk on the street.

"Moments after that, the same Sureño criminal street gang member that they had seen at the store wearing the blue shirt comes running around the corner and produces a firearm. The man that at one time was associated with the Norteño criminal street gang yells out, 'I'm not active. I'm not an active Northerner. I'm not an active Northerner,' and then tells his girlfriend to run, and pushes her out of the way.

"His girlfriend begins to run. The man that was associated with the Norteño criminal street gang is shot dead in the middle of the street, and his girlfriend, who had run, is shot while she's at the front of a nearby driveway close to the house.

"Several months after this, a Sureño criminal street gang member comes to the home of the girlfriend who survived and says something to her to make her scared to come and testify in the incident that happened in which the Sureño criminal street gang member killed her boyfriend.

"Would you have an opinion as to whether or not those crimes, both the murder of the man who was associated with the Norteño criminal street gang and the attempted murder of his girlfriend who was with him, was done for the benefit of, at the direction of or in association with the Ghost Town Sureños and the larger Sureño criminal street gang with a specific intent to promote street gang activity?"

Deputy Goncalves answered, "Yes." He explained that the GTS gang members were dressed in gang attire "to prove a point," and their targeting and shooting of a dropout from a rival gang amounted to "a show of dominance" within the community. As for the shooting of the girlfriend, that reflected "an effort to get rid of any witness, material witness." Finally, "having a Sureño member go to the surviving victim's house is a prime example" of the gang's witness suppression efforts, the aim of which is to facilitate the ability of gang members to commit crimes with impunity.

Defense counsel did not object to the form or substance of the hypothetical posed by the prosecutor or the expert's opinions.

Gonzalez now contends the "unduly specific" hypothetical question, along with Deputy Goncalves's response, "effectively asserted the truth of the entire[ty] of the prosecution['s] gang and murder theories," "reduced the prosecution['s] burden of proof," and "directed a verdict." Gonzalez acknowledges that our Supreme Court's opinion in *People v. Vang* (2011) 52 Cal.4th 1038, 1047-1050 and footnote 3 (*Vang*), forecloses his claim. He explains he raises the claim "for purposes of exhaustion of state remedies."

Preliminarily we note that Gonzalez has forfeited the above contentions for failing to object in the trial court. (*People v. Saunders* (1993) 5 Cal.4th 580, 590; Evid. Code, § 353.) Gonzalez's contentions also fail on the merits, under the holding of *Vang*, *supra*, 52 Cal.4th 1038, which, as Gonzalez acknowledges, is controlling here.

In *Vang*, the prosecutor presented hypotheticals tracking the facts of the case to a gang expert and elicited the expert's opinion that the crimes described in the hypothetical were gang-related. (*Vang*, *supra*, 52 Cal.4th at pp. 1042-1043.) The *Vang* defendant argued (as Gonzalez does here) that the trial court erred in permitting the prosecutor "'to ask a detailed hypothetical question, closely tracking the facts in [the] case, about whether the assault [at issue there] was gang-motivated.'" (*Id*. at p. 1044.) The *Vang* court rejected this contention, holding that the hypothetical questions were proper. *Vang* clarified that hypothetical questions "'must be rooted in facts shown by the evidence'" and "'may not be "based on assumptions of fact without evidentiary support … or on

speculative or conjectural factors.'" (*Id*. at pp. 1045-1046.) *Vang* rejected the notion that a detailed hypothetical "invades the province of the jury," explaining that even if the expert testimony embraces the ultimate issue in contention, the jury nonetheless must decide whether to credit the expert's opinion and the accuracy of the facts reflected in the hypothetical. (*Id*. at pp. 1049-1050.) *Vang* concluded that "[h]ypothetical questions must not be prohibited solely because they track the evidence too closely, or because the questioner did not disguise the fact the questions were based on the evidence." (*Id*. at p. 1051.)

Gonzalez argues the hypothetical posed by the prosecutor in the instant was "unduly specific" because it too closely tracked the facts of his case. Bound as we are by *Vang*'s holding (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), we must reject this contention.

Gonzalez raises, in the alternative, a claim of ineffective assistance of counsel. He argues that, to the extent defense counsel was required to "do more" to preserve his instant claims of error related to the hypothetical posed by the prosecutor and Deputy Goncalves's response, counsel was ineffective. However, in light of *Vang*'s holding, defense counsel's failure to preserve these claims did not constitute ineffective assistance of counsel.

(Doc. No. 20-12 at 26-41 (footnotes omitted)).

**2.  Analysis**

Again, Petitioner does not explain how the state court rejection of each of these claims was unreasonable or that it was based on an unreasonable determination of the facts.  Recently, the Supreme Court made clear that when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Andrew v. White*, No. 23-6573, 2025 WL 247502, at *1 (U.S. Jan. 21, 2025) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *see also*, *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  To obtain relief on an evidentiary ruling, the petitioner must show that the error was of a constitutional dimension and that it was not harmless.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  This requires the error to have had "'a substantial and injurious effect' on the verdict." *Id*. at 623.  Under Ninth Circuit precedent, the admission of evidence can violate the constitution

34

1  "only when there are *no* permissible inferences the jury may draw from the evidence." *Windham*

2  *v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (original emphasis; citation and internal

3  quotations omitted).

4      Here, Petitioner cannot show that the admission of any of the challenged evidence—alone

5  or in combination—amounted to a violation of due process.  First, all the evidence was relevant

6  and offered for a proper purpose.  Evidence of Petitioner's prior conviction was offered as a

7  predicate offense to support the primary activities element of the gang enhancement, not to

8  support that Petitioner had a propensity for violence.  The evidence was limited, consisting of an

9  Abstract of Judgment reflecting Petitioner's sentence, a First Amended Information reflecting the

10  charges, and Goncalves's testimony that manslaughter was listed in § 186.22(e), without any

11  discussion of the underlying facts.  (Doc. No. 20-7 at 65-67; Doc. No. 20-5 at 23-29).  The threat

12  to Shelia was relevant to Shelia's credibility and supported the gang enhancement.  (Doc. No. 20-

13  6 at 123-27).  As to the hypothetical, the Ninth Circuit has recognized that a jury is entitled to

14  consider gang expert testimony, including responses to "specific hypotheticals tailored to the facts

15  of th[e] case." *Huerta v. Adams*, 545 F. App'x 671, 672 (9th Cir. 2013).

16      Furthermore, even if any of the evidence were improperly admitted, Petitioner cannot

17  show that he was prejudiced considering all the additional evidence against him.  Sheila testified

18  concerning the circumstances of the shooting and identified Petitioner as the shooter; in addition

19  to the hypothetical, Goncalves provided detailed testimony regarding the Sureños gang and its

20  subsects, identifying features of members, and the purpose and motivation behind criminal

21  actions; and additional witnesses testified regarding the investigation and evidence linking

22  Petitioner to the crime.  Because significant evidence beyond that challenged by Petitioner

23  supports his convictions, admission of the challenged evidence did not have "a substantial and

24  injurious effect on the verdict." *Id*. at 623 (internal quotations and citations omitted).  *Brecht*, 507

25  U.S. at 623. 619 (1993).

26      Accordingly, Petitioner has not shown that the state court's rejection of his evidentiary

27  challenges was contrary to, or an unreasonable application of, clearly established Supreme Court

28

precedent, nor was it based on an unreasonable determination of the facts. Thus, the undersigned recommends that grounds two, three, and four be denied.

### C.    Ground Five-Limiting Instruction

In ground five, Petitioner challenges the trial court's failure to sua sponte give a limiting instruction regarding his prior conviction. (Doc. No. 1-1 at 21-22). Petitioner asserts that "at a bare minimum, an instruction limiting the prior offense to the pattern element on which it was admissible was sorely needed for appellant to have a fair trial on the charge or the gang allegations." (*Id.*).

#### 1.    State Court Decision

The state appellate court addressed Petitioner's limiting instruction claim as follows:

> ### V.  Limiting Instruction Regarding Gonzalez's Prior Manslaughter Conviction
>
> Gonzalez argues the trial court prejudicially erred in failing sua sponte to instruct the jury with a limiting instruction, such as CALCRIM No. 1403, regarding the evidence of the fact of his prior voluntary manslaughter conviction. He further contends, in the alternative, that trial counsel was ineffective for not requesting a limiting instruction in this regard. Here, the trial court was not required sua sponte to give a limiting instruction with regard to evidence of Gonzalez's prior conviction. Moreover, the record before us does not support a finding that trial counsel was ineffective for failing to request such an instruction.
>
> As discussed in Section II of this opinion, above, an abstract of judgment and other documents pertaining to Gonzalez's prior conviction for voluntary manslaughter with a firearm enhancement, were properly admitted as evidence of a predicate offense, for purposes of proving the gang enhancements and special circumstance. In this context, a pattern instruction, CALCRIM No. 1403, would have instructed the jury that it could consider evidence of the prior conviction only for purposes of proof of the elements of the gang enhancements and gang-murder special circumstance and not for any other purpose. CALCRIM No. 1403 would have further instructed: "You may not conclude from this evidence that the defendant is a person of bad character or that [he] has a disposition to commit crime." However, a limiting instruction along the lines of CALCRIM No. 1403 was neither requested by defense counsel nor given on the court's own motion.
>
> "[A]lthough a court should give a limiting instruction on request, it has no sua sponte duty to give one." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051 (*Hernandez*); *People v. Collie* (1981) 30 Cal.3d 43, 63-64 (*Collie*) [no sua sponte duty to give limiting

instruction on evidence of past criminal conduct].) While the general rule does not require the court sua sponte to give a limiting instruction, there is an exception for "an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose." (*Collie*, *supra*, at p. 64.) "In such a setting, the evidence might be so obviously important to the case that the sua sponte instruction would be needed to protect the defendant from his counsel's inadvertence." (*Ibid.*)

We cannot say that the voluntary manslaughter conviction (with accompanying firearm enhancement) at issue here was a "dominant part of the evidence against the accused" and "both highly prejudicial and minimally relevant to any relevant purpose." (*Collie*, *supra*, 30 Cal.3d at p. 64.) First, as previously discussed in Section II of this opinion, the evidence regarding the prior conviction was limited to documentary evidence establishing the fact of the prior conviction and the jury was not exposed to prolonged discussion of the prior conviction or any of the facts underlying it. Second, the prior conviction was introduced to establish a predicate offense, and as a predicate offense, it was also relevant to establish other elements of the gang enhancements and gang-murder special circumstance. Finally, the evidence of the prior conviction was not a "dominant part of the evidence against the accused." (*Ibid.*) In light of these considerations, we conclude the trial court was not dutybound sua sponte to give a limiting instruction along the lines of CALCRIM No. 1403. (See *Hernandez*, *supra*, 33 Cal.4th at pp. 1051-1053 [no sua sponte duty to give limiting instruction for gang evidence in trial for robbery with criminal street gang enhancement]; *People v. Hinton* (2006) 37 Cal.4th 839, 875 [no sua sponte duty to give limiting instruction on defendant's prior murder conviction admitted in death penalty trial for multiple first degree murders with a firearm].)

Given our conclusion, we must next address Gonzalez's alternative contention that trial counsel was ineffective for failing to request a limiting instruction. As noted, the record does not establish that counsel was ineffective. To establish ineffective assistance of counsel, Gonzalez must show that his counsel's performance fell below an objective standard of reasonableness and that, but for counsel's error, there was a reasonable probability of a different result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) Moreover, "[i]f the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

Here, we cannot simply assume that trial counsel overlooked the possibility of requesting a limiting instruction and was thereby deficient. "A reasonable attorney may have tactically concluded that the risk of a limiting instruction … outweighed the questionable benefits such instruction would provide." (*People v. Maury* (2003) 30 Cal.4th 342, 394; *Hernandez*, *supra*, 33 Cal.4th at

1      p. 1053.) In other words, it reasonably appears that a limiting
       instruction in this case would have added little to the jury's
2      understanding of the case, while drawing unnecessary attention to
       the similarities between the prior conviction offense and the
3      charged offenses. (See, e.g., *People v. Hinton, supra*, 37 Cal.4th at
       p. 878 [failure to request limiting instruction on evidence of prior
4      murder conviction not ineffective assistance because "the
       instructions given were adequate to guide the jury's use of the prior
5      conviction" and "counsel may have deemed it unwise to call further
       attention to it"]; *People v. Ferraez* (2003) 112 Cal.App.4th 925,
6      934 [no ineffective assistance because a "limiting instruction would
       have added little to the jury's understanding of the case [and] the
7      decision not to request one was a reasonable tactical choice by
       defense counsel to avoid directing the jury to focus on the
8      evidence" at issue]; *People v. Freeman* (1994) 8 Cal.4th 450, 495
       [no ineffective assistance because "[c]ounsel may well not have
9      desired the court to emphasize the evidence, especially since it was
       obvious for what purpose it was being admitted"].) Since there is a
10     rational, and potentially, tactical, explanation for not requesting a
       limiting instruction, Gonzalez cannot establish that he received
11     ineffective assistance of counsel.

12     In sum, the trial court did not have a duty to sua sponte give a
       limiting instruction regarding Gonzalez's prior voluntary
13     manslaughter conviction and trial counsel was not
       ineffective in not requesting such an instruction.

14

15     (Doc. 20-12 at 41-44).

16     **2.    Analysis**

17         As explained by the Ninth Circuit, "[t]he Supreme Court has never held that the admission

18     of prior bad acts evidence to prove propensity is unconstitutional" nor has it "held that a limiting

19     instruction is *always* necessary to protect a defendant's due process rights."  *Basurto v. Luna*, 291

20     F. App'x 41, 43 (9th Cir. 2008) (citing *Estelle*, 502 U.S. at 72).  Rather, for the failure to give a

21     jury instruction to violate due process, the failure must have "by itself so infected the entire trial

22     that the resulting conviction violates due process."  *Id.* (quoting *Henderson v. Kibbe*, 431 U.S.

23     145, 154 (1977)).  Under *Brecht*, habeas relief based on trial error may only be granted when that

24     error "had substantial and injurious effect or influence in determining the jury's verdict." 507

25     U.S. at 637.

26         Here, Petitioner cannot show that the trial court's failure to give a limiting instruction

27     amounted to constitutional error or that any alleged error had a substantial and injurious effect or

28     influence on the verdict.  While the trial court did not provide a specific limiting instruction

regarding the prior conviction, it did provide a general instruction that evidence admitted for a limited purpose could be considered "only for that purpose and for no other." (Doc. 20-7 at 138-39). Critically, the evidence of the prior conviction was offered during direct examination of the gang expert specifically addressing predicate offenses. (*See id.* at 54-66). The jury received extensive instructions. The trial court expressly advised the jury not to be biased against Petitioner simply because he had "been arrested, charged with a crime or brought to trial;" informed the jury on the presumption of innocence and the prosecution's burden of proof as to each element of the charges; and instructed the jury on the specific elements that had to be proven to support a conviction for the charged offenses. (Doc. No. 20-7 at 133, 140-53). As discussed above, the evidence regarding Petitioner's previous manslaughter conviction was extremely limited and substantial evidence beyond the prior conviction linked Petitioner to the crimes such that, even if a limiting instruction had been given, there is no reasonable probability that Petitioner would have been acquitted. And, because there is no merit to Petitioner's contention that the failure to give a limiting instruction violated his federal rights, Petitioner's counsel cannot be deemed ineffective for failing to interpose an unmeritorious objection. *United States v. Swanson,* 943 F.2d 1070, 1073 (9th Cir.1991).

Petitioner cannot show that the state court's determination of this claim was contrary to, or an unreasonable application of, clearly established federal law, or that it was an unreasonable determination of the facts in light of the evidence presented. Accordingly, the undersigned recommends that ground five be denied.

### D.    Ground Six-Cumulative Error

In ground six, Petitioner argues the cumulative effect of the other errors alleged in the Petition deprived him of due process. (Doc. No. 1-1 at 19).

"Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudice[d] a defendant." *Cook v. Kernan*, 801 F. App'x 474, 477 (9th Cir. 2020) (internal quotations and citations omitted). The cumulative error, however, "must render the trial and sentencing fundamentally unfair." *Id.* (citations omitted). Absent a finding of any error on any of

1  the proceeding grounds, the Court cannot find cumulative error. *Williams v. Filson*, 908 F.3d

2  546, 570 (9th Cir. 2018) (a court "cannot consider the cumulative effect of *non*-errors"); *see also*

3  *McGill v. Shinn*, 16 F.4th 666, 684 (9th Cir. 2021).

4     Because the undersigned finds none of Petitioner's claims have merit, the undersigned

5  concludes Petitioner cannot show his conviction was fundamentally unfair nor a "unique

6  symmetry" of harmless errors that "amplify each other in relation to a key contested issue in the

7  case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011). Thus, ground six is without

8  merit and should be denied.

9     **V.  CERTIFICATE OF APPEALABIILTY**

10     A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

11  court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253;

12  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing § 2254 Cases requires a

13  district court to issue or deny a certificate of appealability when entering a final order adverse to a

14  petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

15  Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial

16  showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires

17  the petitioner to show that "jurists of reason could disagree with the district court's resolution of

18  his constitutional claims or that jurists could conclude the issues presented are adequate to

19  deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v.*

20  *McDaniel*, 529 U.S. 473, 484 (2000). Because the petitioner has not made a substantial showing

21  of the denial of a constitutional right, the undersigned recommends that the court decline to issue

22  a certificate of appealability.

23     Accordingly, it is **RECOMMENDED**:

24     1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

25      1); and

26     2.  Petitioner be denied a certificate of appealability.

27        **NOTICE TO PARTIES**

28     These Findings and Recommendations will be submitted to the United States District

1    Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

2    after being served with a copy of these Findings and Recommendations, a party may file written

3    objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

4    "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

5    **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

6    wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

7    CM/ECF document and page number, when possible, or otherwise reference the exhibit with

8    specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

9    the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

10   636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

11   waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

12

13   Dated:    February 20, 2025

14                                                                HELENA M. BARCH-KUCHTA

15                                                                UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28